UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

CHARLES PLACE ASSOCIATES,          :
                 Plaintiff,         :
                                    :
     v.                             :          CA 09-535 S
                                    :
CARRIER CORPORATION, Individually  :
and doing business as "CARRIER      :
COMMERCIAL SERVICE, a Division of  :
Carrier Corporation,"              :
                 Defendant.         :


## REPORT AND RECOMMENDATION

David L. Martin, United States Magistrate Judge

Before the Court is Plaintiff's Emergency Motion for Preliminary Injunctive Relief (Docket ("Dkt.") #13) ("Emergency Motion for Preliminary Injunction" or "Motion") filed by Plaintiff Charles Place Associates ("Plaintiff"). The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).[1] After consideration, I recommend that the Motion be granted to the extent stated herein.

---

[1] "Under 28 U.S.C. § 636(b)(1)(B), a district judge may refer a motion for injunctive relief ... for a report and recommendation[.] A magistrate judge does not have authority to grant or deny injunctive relief, absent the parties' consent under section 636(c)." Guan Zhao Lin v. Holder, No. 10 Civ. 4316(RMB)(JLC), 2010 WL 2836144, at *1 n.1 (S.D.N.Y. July 2, 2010); see also Anglers of Au Sable v. U.S. Forest Serv., 402 F.Supp.2d 826, 828 (E.D. Mich. 2005)(withdrawing order of reference "because the magistrate judge is without authority (absent consent of the parties) to grant injunctive relief").

## I. Background

This is an action to enforce a May 15, 2009, settlement agreement (the "Settlement Agreement") between the parties in a prior action, <u>Charles Place Associates v. Carrier Corp., et al.</u>, CA 07-368 S (the "Prior Action").[2]  <u>See</u> Complaint to Enforce Settlement Agreement ("Complaint") ¶¶ 9-10, 12, prayer for relief. Plaintiff also seeks compensatory damages for increased costs and expenses allegedly attributable to the failure of Defendant Carrier Corporation ("Carrier") to perform its obligations under the Settlement Agreement.  <u>Id.</u>, prayer for relief.

"Charles Place" is an apartment complex owned and operated by Plaintiff at 460 Charles Street, Providence, Rhode Island, whose residents include elderly and disabled individuals.  Memorandum in Support of Plaintiff's Emergency Motion for Preliminary Injunctive Relief ("Plaintiff's Mem.") at 2.  In or around 2005 Plaintiff purchased a combined power, heat, and chilled water system with auxiliary equipment (the "Cogeneration System" or "System") from Carrier.[3]  According to Plaintiff:

> The Cogeneration System is comprised of many

_____

[2] On January 13, 2012, Plaintiff Charles Place Associates ("Plaintiff") filed an Amended Complaint (Dkt. #35) adding counts for recission of the Settlement Agreement (Count II), breach of express warranty (Count III), and breach of implied warranty (Count IV).

[3] The Amended Verified Complaint filed in the Prior Action (CA 07-368 S) noted that Carrier's equipment "does not comprise the entire [cogeneration] system, but will nevertheless be hereinafter referred to as either 'the cogeneration system' or ... 'the system' ...."  Amended Verified Complaint (Prior Action Dkt. #20) ¶ 15.

sensitive components, including micro-turbine engines which are similar to small jet engines.[4] In brief, these micro-turbines are powered by natural gas. As the turbines run they "spin" a[n] electrical generator which creates electricity used to power the Charles Place apartment complex. A by-product of this process is heat. However, rather than allowing this heat to escape as waste, the Cogeneration System "recaptures" it and uses it [to] produce heat, hot water, and air-conditioning to the Charles Place apartments. Thus, the utility of the Cogeneration System is its ability to significantly reduce Plaintiff's fuel costs by recapturing this heat and using it as fuel, rather than the consumption of more natural gas and/or purchasing electricity from outside suppliers, such as National Grid Electric Company.

When the Cogeneration System fails or is shut-down for repairs during the summer months, there is no back-up for air-conditioning. If and when this happens, the residents of Charles Place — and, in particular, the elderly and disabled residents — are left in a position of imminent peril without air-conditioning.

When the Cogeneration System fails during the winter, Charles Place has a back-up generator for electricity and a heating system that operates independently on natural gas. However, its fuel costs increase significantly and the utility of the Cogeneration System is completely lost.

Plaintiff's Mem. at 2-3 (citations omitted).

Carrier's description of the System is similar:

The System provides electricity, heat and air conditioning to the Complex. The System runs on natural gas, which fuels micro-turbines. ... The micro-turbines use natural gas to generate electricity to be used by the Complex thereby allowing the Complex to be "off the grid." This means that the Complex does not need to purchase electricity from a supplier such as National

_____

[4] Defendant Carrier Corporation ("Carrier") states that "[t]he micro-turbines were manufactured by and purchased by Carrier from a third-party vendor, Capstone Turbine Corporation (hereinafter 'Capstone')." Defendant Carrier Corporation's Opposition to Plaintiff's Emergency Motion for Preliminary Injunctive Relief (Dkt. #23) ("Carrier's Post-Hearing Mem." or "Carrier's P.H. Mem.") at 2.

Grid. As the micro-turbines generate electricity, they also produce exhaust heat. The System then recaptures the exhaust heat and uses it to produce heat, domestic hot water, and air conditioning for the apartments in the Complex. As a result of the installation of the System, the Complex has been able to disconnect completely from the electrical grid. ...

In the event of a System failure, there are two emergency generators in place to provide electricity to the Complex. In addition, there is a natural gas-fired boiler that can provide heat during the heating seasons. As such, the Complex has back-up systems to provide electricity and heat to the residents in the event that the System is out of service for any reason. There is no backup System in place to provide air conditioning to the Complex.

Defendant Carrier Corporation's Opposition to Plaintiff's Emergency Motion for Preliminary Injunctive Relief (Dkt. #23) ("Carrier's Post-Hearing Mem." or "Carrier's P.H. Mem.") at 2.

In the Prior Action, Plaintiff alleged that the Cogeneration System had not performed as Carrier had promised. See Prior Action Amended Verified Complaint ¶ 32. Among other shortcomings, Plaintiff complained that pumps or other components of the System had overheated on several occasions, id. ¶ 34; that the System had suddenly and unexpectedly shut down for several hours resulting in a loss of power and numerous complaints from staff and tenants, id. ¶ 35; that on or about July 20, 2007, Carrier representatives had advised Plaintiff for the first time that periodic shutdowns of approximately four hours were necessary for maintenance of the System, id. ¶ 38; that until January or February of 2008 Carrier had refused to deploy an emergency generator to provide power

during any unexpected or planned "outages," id. ¶ 39; and that on September 27, 2007, Carrier's representatives advised Plaintiff that they needed to take the System out of operation for about 15 to 30 minutes, but the work took much longer, id. ¶¶ 40-41. Plaintiff further alleged that it had advised Carrier prior to purchasing the System that Charles Place required a continuous supply of electricity and power and that Plaintiff would not have purchased the System if it could not perform in that fashion. Id. ¶ 42.

The Prior Action was resolved by the execution of the Settlement Agreement between the parties in May 2009. Incorporated into the Settlement Agreement was a ten year Service Agreement pursuant to which Carrier would provide preventive maintenance, routine operating inspections, and remote monitoring of the system. See Service Agreement for Charles Place ("Service Agreement") at 3.

In its memorandum in support of the instant Motion, Plaintiff alleges that notwithstanding the requirements of the Settlement Agreement and Service Agreement, Carrier has repeatedly and consistently failed to take preventive measures and appears to respond only when there is a system failure or mechanical problem. See Plaintiff's Mem. at 3. Plaintiff further alleges that this has resulted in repeated failures in the Cogeneration System which could have been avoided if Carrier had undertaken routine inspections and preventive maintenance. Id. In addition,

Plaintiff contends that when problems with the System have arisen Carrier technicians have often been without the parts necessary to restore it to operation in a timely and expeditious manner.  Id. Lastly, Plaintiff charges that on several occasions Carrier technicians have taken without permission parts from two turbines (the "Extra Turbines") that – pursuant to the Settlement Agreement – were to be disconnected from the Cogeneration System and remain Plaintiff's property.  Id. at 3-4.

## II.  Relief Sought

In its original Complaint in this action,[5] Plaintiff sought a declaratory judgment pursuant to 28 U.S.C. § 2201 that Carrier is in material breach of its obligations under the Settlement Agreement and has failed to perform them in a reasonable and timely manner.  See Complaint, prayer for relief.  Plaintiff also requested that the Court enforce the Settlement Agreement by entering an order requiring Carrier to complete all of its obligations within thirty days.  In addition, Plaintiff asked for an award of compensatory damages for its expenses and/or increased costs associated with the continued operation of the System without the changes to which Carrier agreed in May 2009.  Lastly, Plaintiff sought attorney fees and costs for being required to commence the

_____

[5] As previously noted, Plaintiff has filed an Amended Complaint adding additional counts.  See n.2.  However, for purposes of this Report and Recommendation, the Court refers to the relief requested in the original Complaint as that was the operative pleading at the time of the hearing on the instant Emergency Motion for Preliminary Injunction.

action.

By the instant Motion, Plaintiff seeks an order requiring Carrier to comply with the terms of the Settlement Agreement entered in the Prior Action. Specifically, Plaintiff asks that Carrier be ordered to:

(1) Immediately replace all batteries that have not been replaced within the last five (5) years;

(2) Replace, at the time of switch-over from air-conditioning to heat, the water tower air circulation motor and immediately make available at the Charles Place a replacement water tower air circulation motor and any necessary parts to effect the replacement in case of a failure prior to switch-over;

(3) Immediately change all filters that have not been replaced in the last year;

(4) Put into working order _and_ utilize the Remote Monitoring system required by the Settlement Agreement;

(5) Immediately provide Plaintiff with a "maintenance and inspection report (log)" for all maintenance and repairs performed at Charles Place from May 15, 2009 to the present;

(6) Immediately perform a full system review and inspection of the Cogeneration system to identify items in need of care, and to undertake repair and/or replacement of any such items to ensure the proper function of the Cogeneration System;

(7) Henceforth perform and continue to perform all routine inspections and maintenance, including but not limited to those items identified as "Scheduled Maintenance" on the "Capstone MicroTurbine User's Manual" (i.e., attached [as Ex. 4 to the Motion]) and those identified in Carrier's Service agreement (i.e., attached [as Ex. 5 to the Motion]) to ensure the proper function of the Cogeneration System;

(8) Immediately restore all turbines, including the "Extra Turbines" to operational condition and demonstrate

7

their operation to Plaintiff;

(9) Henceforth refrain from taking parts from the Extra turbines without the express permission of Plaintiff and, where such permission is given, restore any items taken within ten (10) days from the date taken and test-run the unit as proof of same;

(10) Pay Plaintiff its costs and attorneys fees incurred in filing this action and making this motion; and/or

(11) Take such other action as this Court deems just and appropriate under the circumstances.

Motion at 1-2 (underlining omitted).

In a post-hearing memorandum, Plaintiff modified the above requests based on the evidence adduced at the hearing and actions taken by Carrier around the time of the hearing or immediately thereafter. See Post-Hearing Memorandum in Support of Plaintiff's Motion for Preliminary Injunctive Relief (Dkt. #24) ("Plaintiff's P.H. Mem.") at 14. As modified, Plaintiff seeks an order requiring Carrier to do the following. The modifications appear in italics:

(1) Immediately replace all batteries that have not been replaced within the last five (5) years, *including the batteries on turbines #5 and #6*.

(2) Replace, at the time of switch-over from air-conditioning to heat, the water tower air circulation motor and immediately make available at the Charles Place a replacement water tower air circulation motor and any necessary parts to effect the replacement in case of a failure prior to switch-over.

(3) Put into working order and utilize the Remote Monitoring system required by the Settlement Agreement.

*(4) Immediately perform all maintenance – including replacements – listed in the "Capstone MicroTurbine User's Manual" which is not reflected in the Service Reports as having been completed in the last year; and*

*provide a complete log of all actions undertaken upon completion thereof.*

*(5) Immediately perform all maintenance – including replacements – listed in the Prior Service Agreement which is not reflected in the Service Reports as having been completed in the last year, and provide a complete log of all actions undertaken upon completion thereof.*

*(6) Immediately perform all repairs previously recommended by Carrier technicians and not yet conducted, including:*

- *Replace the ECM control board on turbine 2 (see Ex. 1, 39/64);*
- *Replace the hot water pump "cradle" and rubber bushings (see Ex. 1, 41/64);*
- *Replace the BCM control board taken from turbine #8 (see Ex. 1, 41/64);*
- *Replace the batteries in turbines 5 and 6 (see Ex. 1, 55/64, 59/64 & 61/64); and,*
- *Replace all parts noted in the technician report of June 17, 2011. (See Ex. 1, 56/64).*

(7) Immediately restore all turbines, including the "Extra Turbines" (i.e., turbines #7 and #8) to operational condition and demonstrate their operation to Plaintiff.

*(8) Provide a complete log of all actions undertaken upon completion of Items 1-7 (or such portions thereof as this Court shall Order Carrier to perform.*

(9) Henceforth perform and continue to perform all routine inspections and maintenance, including but not limited to those items identified as "Scheduled Maintenance" on the "Capstone MicroTurbine User's Manual" to ensure the proper function of the Cogeneration System, and provide Plaintiff with a complete log of such activities.

(10) Henceforth refrain from taking parts from the Extra Turbines without the express permission of Plaintiff and, where such permission is given, restore any items taken within ten (10) days from the date taken and test-run the unit as proof of same[.]

(11) Award Plaintiff its costs and attorneys fees

incurred in filing this action and making this motion; and/or,

(12) Take such other action as this Court deems just and appropriate under the circumstances.

Plaintiff's P.H. Mem. at 15-16 (underlining omitted).

## III. Travel

Plaintiff filed this action on November 6, 2009. <u>See</u> Complaint. The instant Emergency Motion for Preliminary Injunction was filed on August 3, 2011. A hearing on the Motion was initially scheduled for August 17, 2011, <u>see</u> Notice and Order (Dkt. #14), and then rescheduled to August 19th at Carrier's request, <u>see</u> Defendant's Emergency Assented to Motion to Reschedule Hearing (Dkt. #15). At the August 19, 2011, hearing, the Court listened to argument, heard testimony from H. Charles Tapalian, and received Plaintiff's Exhibit ("Ex.") 1 (64 pages of service reports). The hearing resumed on August 23rd with Plaintiff presenting testimony from David Iascone and Dennis D'Ambra and introducing additional exhibits. Carrier presented testimony from Keith Savas. Both sides then rested. The Court requested post-hearing memoranda which the parties subsequently filed on September 7, 2011. <u>See</u> Plaintiff's P.H. Mem.; Carrier's P.H. Mem. Thereafter, the Court took the matter under advisement.

## IV. Legal Standard

A plaintiff seeking a preliminary injunction must establish that: (1) he is likely to succeed on the merits, (2) he is likely

to suffer irreparable injury in the absence of preliminary relief, (3) the balance of the equities tips in his favor, and (4) the injunction is in the public interest.  <u>Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.</u>, 645 F.3d 26, 32 (1st Cir. 2011) (citing <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 129 S.Ct. 365 (2008)); <u>see also</u> <u>Esso Standard Oil Corp. (Puerto Rico) v. Monroig-Zayas</u>, 445 F.3d 13, 18 (1st Cir. 2006); <u>Borinquen Biscuit Corp. v. M.V. Trading Corp.</u>, 443 F.3d 112, 115 (1st Cir. 2006).  The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor.  <u>Esso Standard Oil Corp. (Puerto Rico) v. Monroig-Zayas</u>, 445 F.3d at 18; <u>Baldwin v. Bader</u>, No. 07-46-P-H, 2008 WL 564642, at *1 (D. Me. Feb. 28, 2008).  "This burden is a heavy one: 'Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.'"  <u>Friends of Magurrewock, Inc. v. U.S. Army Corps of Eng'rs</u>, 498 F.Supp.2d 365, 369 (D. Me. 2007)(quoting <u>Greater Yellowstone Coal. v. Flowers</u>, 321 F.3d 1250, 1256 (10th Cir. 2003)); <u>see also</u> <u>Voice of the Arab World, Inc.</u>, 645 F.3d at 32 ("A preliminary injunction is an 'extraordinary and drastic remedy[]' that 'is never awarded as of right.'")(internal citations omitted); <u>Baldwin v. Bader</u>, 2008 WL 564642, at *1 ("The court must 'bear constantly in mind that an [i]njunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case.'")(quoting <u>Saco Def. Sys. Div.</u>

Maremont Corp. v. Weinberger, 606 F.Supp. 446, 450 (D. Me. 1985))
(alteration in original).

The *sine qua non* of the four part test is likelihood of
success on the merits: if the moving party cannot demonstrate that
it is likely to succeed in its quest, the remaining factors become
matters of idle curiosity. Esso Standard Oil Corp. (Puerto Rico)
v. Monroig-Zayas, 445 F.3d at 18 (quoting New Comm Wireless Servs.,
Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)); see also
McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001)(stating that
movant must show "a substantial likelihood of success on the
merits").  The greater the likelihood of success on the merits, the
less that is required in the way of irreparable harm.  Ross-Simons
of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996).

Nevertheless, the Supreme Court has repeatedly held that "the
basis for injunctive relief in the federal courts has always been
irreparable injury and the inadequacy of legal remedies." Voice of
the Arab World, 645 F.3d at 32 (quoting Weinberger v. Romero-
Barceló, 456 U.S. 305, 312, 102 S.Ct. 1798 (1982)).  Perhaps the
single most important prerequisite for the issuance of a
preliminary injunction is a demonstration that if it is not granted
the applicant is likely to suffer irreparable harm before a
decision on the merits can be rendered.  Id. (citing 11A Charles
Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and
Procedure § 2948.1 (2d ed. 1995) at 139).  Thus, an injunction

12

should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable.  Id. (citing Romero-Barceló, 456 U.S. at 312).

A traditional, prohibitory preliminary injunction preserves the status quo.  See Francisco Sánchez v. Esso Standard Oil Co., 572 F.3d 1, 19 (1st Cir. 2009)("the purpose of a preliminary injunction is to preserve the status quo *before* the merits have been resolved"); see also Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 40-41 (1st Cir. 2010)(distinguishing a mandatory preliminary injunction from a prohibitory preliminary injunction).  In contrast, a mandatory preliminary injunction requires affirmative action by the non-moving party in advance of trial.  Braintree Labs, Inc., 622 F.3d at 41.  "Because a mandatory preliminary injunction alters rather than preserves the status quo, it 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'"  Id. (quoting Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency, 649 F.2d 71, 76 n.7 (1st Cir. 1981)).  "Nevertheless, those exigencies should still be measured according to the same four-factor test, as '[t]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.'"  Id. (quoting Crowley v. Local No. 82, 679 F.2d 978, 996 (1st Cir. 1982), rev'd on other grounds, 467 U.S. 526, 104 S.Ct. 2557 (1984)).

## V. Undisputed Matters

The following facts are undisputed. On May 15, 2009, the parties entered into the Settlement Agreement to resolve the Prior Action. Incorporated into the Settlement Agreement was a ten year Service Agreement which requires Carrier, for an agreed price, to provide preventive maintenance, routine operating inspections, and remote monitoring of the System.[6] See Service Agreement at 3. Plaintiff has paid and continues to pay all sums due under the Service Agreement.[7]

## VI. Application of Legal Standard

### A. Likelihood of Success

As explained hereafter, the Court finds that Plaintiff has a strong likelihood of success on its claim that Carrier has breached

---

[6] Carrier's service supervisor, Keith Savas ("Mr. Savas"), testified that although only four turbines are covered by the Service Agreement, Carrier had replaced a battery on a fifth turbine as a means of showing good faith. See Tr. II at 109. Plaintiff responds that at the time the Settlement Agreement was executed Carrier had represented that the System was capable of operating on four turbines and that Plaintiff, in reliance on this representation, agreed to a Service Agreement covering only four turbines. See Plaintiff's P.H. Mem. at 8 n.5. It was later discovered (apparently in June 2010) that the System could not operate effectively during the summer months with only four turbines. Id. Thus, Plaintiff contends that if Carrier had not misrepresented the capabilities of its System, there would be no need for maintenance on these two additional turbines because they would not be in use. Id.

[7] For the first two years of the Service Agreement, the price was $36,485 annually. See Service Agreement at 1. The price increased to $46,910 for the third year and increased again to $57,334 for the remaining seven years of the agreement. Id. Plaintiff's counsel represented at the August 19, 2011, hearing that Plaintiff had made a payment of $14,333 on June 29, 2011, for three months of service (4 x $14,333 = $57,332).

its obligation under the Settlement Agreement at least to the extent that Carrier has not complied with its obligation to provide "[a] maintenance and inspection report (and log) to the Customer at the end of each contract year." Service Agreement, Attachment ("Att.") 1 (Scope of Service). This finding is based on the following facts.

The Settlement Agreement incorporates the Service Agreement. <u>See</u> Settlement Agreement at 1 ¶ 5. Part of the Service Agreement is the attachment entitled Scope of Service. <u>See</u> Service Agreement at 2; <u>see also</u> <u>id.</u>, Att. 1 (Scope of Service). The Scope of Service states that a "maintenance and inspection report (and log) will be provided to the Customer at the end of each contract year." Service Agreement, Att. 1 at 1. The contract year is from May 1 to April 30. Service Agreement at 1. However, Mr. Savas testified that there is no annual report of the maintenance and inspections performed on the System.[8] <u>See</u> Hearing Transcript Day II (Dkt. #33)

---

[8] Mr. Savas testified on direct examination:

Q.   I'm going to represent to you that these are the documents that have been marked as Exhibit 1. Have you seen those before?

A.   Yes.

Q.   And do those constitute all of the maintenance and inspection report logs that Carrier generates in connection with this property?

A.   To my knowledge, yes.

Q.   And is there any log, annual log as I believe you heard Mr. D'Ambra make reference to with other companies at

("Tr. II") at 115.  He also testified that it is possible that routine maintenance is performed and not recorded in the documents marked as Ex. 1.  Id. at 115-116.

Carrier's failure to provide the "maintenance and inspection report (and log)" on an annual basis violates the Service Agreement and is a material breach of the Settlement Agreement.  Plaintiff needs to have the ability to verify that the Cogeneration System is being properly maintained.  It can reasonably be inferred that it was this need which prompted the inclusion of the requirement in

---

Carrier?

A.    No.

Hearing Transcript Day II (Dkt. #33) ("Tr. II") at 114-115.  During his cross-examination, Mr. Savas confirmed the above testimony:

Q.    Okay.  Now I believe that when you answered questions from Mr. Callaghan you indicated that you knew of nothing other than what we produced in Exhibit 1 which I believe you still have, the 64 page document?

A.    Correct.

Q.    Okay.  So is there – would you call those logs?

A.    These are considered service logs, yes.

Q.    Okay.  And is there any document entitled a maintenance and inspection report?

A.    No.

Q.    Is – so to your knowledge was Charles Place given any report or logs at the end of the contract year 2010?

A.    As far as a report, no.

Tr. II at 136-137.

the Settlement Agreement that Carrier furnish Plaintiff with a maintenance and inspection report on an annual basis. Mr. Savas' testimony that at times maintenance is performed and not recorded makes it almost impossible for Plaintiff to determine whether prescribed maintenance is, in fact, being performed as required.[9]

---

[9] With respect to maintenance being performed but not recorded, Mr. Savas testified to this on both direct and cross examination:

> Q. Now if preventative maintenance is performed as required by the Capstone documents, is every item of maintenance then put in the Carrier work documents that have been marked as Exhibit 1?
>
> A. No.
>
> Q. Okay. Are there items that may not actually get put into that handwritten note or typewritten note?
>
> A. Yes.
>
> Q. Okay. Does that in your understanding mean that the routine maintenance was not performed?
>
> A. No.
>
> Q. And just so I understand your testimony correctly it's possible that routine maintenance is being performed and not logged in those documents that are marked as Exhibit 1?
>
> ...
>
> A. Yes.

Tr. II at 115-116. On cross-examination, Mr. Savas testified:

> Q. Okay. So what you're asking us to understand and believe is that maintenance takes place, parts are ordered and it's not recorded on many occasions, correct?
>
> A. From time to time, yes.
>
> Q. Okay. And your testimony that maintenance has been done is not based on entries in the logs, correct?

It is true that the Service Agreement does not specifically prescribe what information will be contained in the "maintenance and inspection report (and log)" which is to be provided at the end of each contract year. However, this requirement is reasonably understood to be a written record which reflects all maintenance and inspections performed on the System during the preceding year and which allows the reader to compare the maintenance performed against the maintenance prescribed by the manufacturer of the equipment. Plaintiff has plausibly identified the Capstone MicroTurbine User's Manual at 41-43, see Plaintiff's Mem., Ex. 4 (Capstone MicroTurbine User's Manual ("Capstone Manual")), and Plaintiff's prior service agreement with Carrier, see id., Ex. 5 (Prior Service Agreement),[10] as providing the latter information.

---

    A.   Correct.

    Q.   It's not based on doing it yourself?

    A.   Correct.

    Q.   And you have no records of it.

    A.   Correct.

Id. at 148-149.

    [10] Regarding the prior service agreement, Plaintiff states:

    Carrier's Prior Service Agreement provides detail regarding
    what "Preventive Maintenance" should be performed on the other
    components [in addition to the micro-turbines] of the
    Cogeneration System, including the Cooling Tower, Pumps,
    Absorption Chiller, and Hot Water Boiler [citing Plaintiff's
    Mem., Ex. 5]. This includes an extensive laundry list of

18

Carrier's argument that Ex. 1 satisfies the requirement of an annual report (and log) is unpersuasive for four reasons. First, the service reports are not provided on an annual basis but at the completion of each service call. See Tr. II at 149. Second, a collection of loose sheets of paper does not constitute a log.[11] Third, despite Mr. Savas' testimony that to his knowledge Ex. 1 constituted all of the maintenance records for the System, see Tr. II at 115, Plaintiff's representatives discovered after the hearing twelve additional service reports which were not included in Ex. 1, see Plaintiff's P.H. Mem. at 6 n.4; see also id., Appendix A. Fourth, Mr. Savas' testimony that some maintenance work is performed but not recorded on the service report undercuts any claim that the reports could constitute the log.

---

inspections, calibrations, cleaning, and logging data.

Plaintiff's P.H. Mem. at 6.

[11] Webster's Third New International Dictionary of the English Language Unabridged (1993), includes the following definition for the noun log:

3 [short for *logbook*] a: ... b: any of various other journals or records in which are noted sequential data on the speed or progress or performance of something: (1): a record of a flight by an airplane or of the operating history of an airplane or of a piece of its equipment or of the flying time of a pilot or other aircrew member (2): a record of the performance of an engine or boiler or similar piece of equipment ....

Id. at 1330.

## B.  Irreparable Harm

At first glance, the failure to provide a service log on an annual basis might not seem to rise to the level of irreparable harm, but a more careful analysis persuades the Court otherwise. Plaintiff brought the Motion on an emergency basis because the System has experienced repeated failures and in the event of a failure during the warm weather months there is no way of cooling the rooms.  The rooms are occupied by handicapped and elderly persons, Hearing Transcript Day I (Dkt. #32) ("Tr. I") at 25-26, and they lack cross-ventilation, Tr. II at 80-81.  The uncontradicted testimony is that when the air conditioning fails the rooms heat up very quickly and that the stone and brick building holds heat.  Id.  Although the loss of power has not exceeded three to four hours in length since the summer of 2010 and no serious health problems have yet resulted, the potential for serious health consequences among elderly and disabled residents is undeniable.  The Court is not precluded from finding irreparable harm merely because no resident has yet been directly harmed as a result of a failure of the System.  See Braintree Labs, Inc., 622 F.3d at 41 ("[t]he focus always must be on *prevention of injury* by a proper order, not merely on preservation of the status quo'") (quoting Crowley, 679 F.2d at 996)(italics added).

## C. **Balance of the Equities**

The Court is also satisfied that the harm to Plaintiff because of Carrier's failure to comply with the Settlement Agreement substantially outweighs any harm or burden to Carrier if the preliminary injunction is granted.  Although Carrier accurately points out that because Plaintiff is seeking to force Carrier to take affirmative action and the Court must take this into consideration in deciding whether to grant relief, this circumstance is substantially tempered by the fact that Carrier agreed to provide a maintenance and inspection report (and log) at the end of each contract year, and the preliminary injunction will simply require Carrier to do something which it is contractually obligated to do.

Mr. Savas' testimony that there is no annual maintenance and inspection report (or log), see Tr. II at 115, 136, 149, does not persuade the Court that requiring Carrier to provide such a log would tip the balance of equities in Carrier's favor.  If (as Carrier indicates) it does not currently have such a report or log, creating the format for one should not take more than a few hours utilizing information contained in the Capstone Manual and the Prior Service Agreement.  While inputting the information from past service records may take some additional time, the total time required to create a log which could be utilized going forward on

an annual basis would not be unduly burdensome.  With regard to Mr. Savas' testimony that some maintenance has been performed in the past but not recorded, this practice may require that Carrier repeat some maintenance (which is presently undocumented) to insure that the log accurately reflects all the maintenance that has been performed and when it was performed.  In other words, if Carrier is unable to document that particular maintenance required by the log has been performed in the past as scheduled, Carrier must perform it again.  While there is some burden associated with this requirement, it is not unfair to place it upon Carrier as Carrier's failure to document all maintenance has created the problem.

### D.  Public Interest

To the extent that there is a public interest in this matter, it weighs in favor of granting the preliminary injunction. Reducing the chance of a breakdown (and also shortening the duration of any breakdown) during the hot weather months decreases the likelihood that public safety personnel will have to respond to Charles Place to deal with medical emergencies among the elderly and disabled residents due to overheated rooms.  The fact that Charles Place provides federally subsidized housing under "the Section 8" housing program administered by the Department of Housing and Urban Development ("HUD"), <u>see</u> Tr. I at 25, also favors the granting of the Motion as there is a public interest in having

such subsidized tenants reside in buildings that are safe and do not pose a danger to the residents' health.

## VII.  Finding

For the reasons stated above, the Court finds that the relevant factors weigh in favor of granting the Motion to the extent that it seeks to require Carrier to comply with the Settlement Agreement and provide a maintenance and inspection report (and log) at the end of each contract year.

## VIII.  Specific Relief

To the extent that Plaintiff in its post-hearing memorandum expanded the specific relief sought by the instant Motion, the Court concludes that it would be inappropriate to order Carrier to take measures as to which Carrier had no opportunity to be heard. With regard to the other specific relief identified in the Motion, the Court makes the following findings.

### A.  Batteries

Plaintiff's request that Carrier be ordered to replace all batteries which have not been replaced within the last five years has been mooted.  Two of the micro-turbines had their batteries replaced on June 1, 2011.  See Ex. 1 at 52.  New batteries were installed in three micro-turbines on August 25 and 26 and September 1, 2011.  See Carrier's P.H. Mem. at 10; id., Ex. A; see also Tr. II at 108.

**B. Replace Water Tower Air Circulation Motor and Obtain Replacement**

The Court is unpersuaded that Plaintiff has demonstrated that this relief is necessary and required by the Settlement Agreement. Plaintiff's witnesses all acknowledged that they were not experts in the maintenance requirements of the System. <u>See</u> Tr. I at 44; Tr. II at 26, 77. In the absence of stronger evidence as to the need for the requested replacement, the Court declines to order it.

**C. Change All Filters**

At the hearing, the evidence established that all the filters had been replaced by Carrier on July 28, 2011. <u>See</u> Tr. II at 79, 111-112. Accordingly, this request for relief is moot.

**D. Remote Monitoring System**

With respect to the remote monitoring system, the Court is not persuaded that Plaintiff has met its burden with respect to this matter. While Plaintiff's witnesses testified that rarely, if ever, are they notified of a problem with the System by the remote monitoring system, <u>see</u> Tr. I at 33-34; Tr. II at 42, the most recent evidence presented at the hearing was that the monitoring system was tested and found to be operational, <u>see</u> Tr. II at 99, 113-114, 144-145.

**E. Inspection and Maintenance Report**

As already explained above, the Court finds that Plaintiff is

entitled to this relief.  Carrier should be ordered to provide the
maintenance and inspection report (and log) within thirty days and
thereafter provide such report within thirty days of the end of
each contract year.

**F.   Perform System Review and Inspection**

This request should be granted only to the extent that it is
necessary to provide the maintenance and inspection report (and
log) referred to above.  As previously noted, Carrier's practice of
performing maintenance but not documenting such work may
necessitate that the same work be performed again in order to
document that it has been performed.

**G.   Perform Routine Inspections and Maintenance**

To the extent that this request seeks to require Carrier to
perform routine inspections and maintenance in accordance with the
Capstone Manual and the Prior Service Agreement, it should be
granted as the Court has determined that the maintenance and
inspection report (log) which Carrier is contractually obligated to
provide to Plaintiff at the end of each contract year contemplates
such performance.

**H.   Restore Turbines to Operating Conditions**

Mr. Savas testified at the hearing that all turbines had been
restored to operating condition except one which needed a battery
control module.  <u>See</u> Tr. II at 123-124.  Carrier in its post-

hearing memorandum has provided a copy of a September 1, 2011, report which states that the battery control module had been installed on the remaining turbine and that "THERE IS 6 TURBINES ON LINE @ THIS TIME." Carrier's P.H. Mem., Ex. A at 7. Accordingly, the Court finds that this request for relief is moot.

**I.   Refrain from Taking Parts for Extra Turbines without Permission**

The Court declines to recommend that this request for relief be granted because there was no evidence presented at the hearing that parts had been taken from the Extra Turbines without permission. See Tr. I at 35; Tr. II at 124. Indeed, Mr. Savas testified that Carrier intends to ask for permission in the future before it takes any parts from the Extra Turbines. See Tr. II at 124.

**J.  Costs and Attorney Fees**

Plaintiff has not cited any authority in support of its request for an award of costs and attorney fees, and the Court declines to recommend such an award.

**IX.  Summary**

Based on the above stated facts and applicable law, I find that (1) Plaintiff is likely to succeed on the merits of its claims against Carrier in that Carrier has breached its obligations under the Settlement Agreement to provide a "maintenance and inspection

report (and log)" at the end of each contract year, (2) Plaintiff is likely to suffer irreparable injury if the injunction is not granted, (3) the balance of the equities tips in Plaintiff's favor, and (4) the injunction is in the public interest. Thus, Plaintiff has met its heavy burden of showing that its request for a preliminary injunction should be granted. Accordingly, I recommend that the Motion for Preliminary Injunction be granted to the extent that Carrier be ordered to comply with its obligation to provide a maintenance and inspection report (and log) to Plaintiff at the end of each contract year.[12] I further recommend that Carrier be required to provide the report (and log) within thirty days and that the log reflect the maintenance requirements and inspections contained in the Capstone Manual and the Prior Service Agreement. I additionally recommend that the log reflect all the maintenance performed from May 15, 2009, to the present and that to the extent that Carrier is unable to document that maintenance and inspections have been performed since May 15, 2009, that such maintenance and inspections be performed and documented within sixty days. To the extent that the Motion seeks greater relief, I recommend that it be denied.

## X.  Conclusion

For the foregoing reasons, I recommend that the Motion be

---

[12] The contract year ends on April 30 of each year until April 30, 2018. <u>See</u> Settlement Agreement, Att. (Service Agreement) at 1.

granted to the extent stated above.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); District of Rhode Island Local Rule Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


*/s/ David L. Martin*
DAVID L. MARTIN
United States Magistrate Judge
February 24, 2012